OPINION OF THE COURT
Emily Pines, J.
Petitioner Personal Communications Devices, LLC (PCD) moves, by order to show cause (motion sequence No. 001), for an order permanently staying the arbitration entitled HTC Am., Inc., and HTC Corp. v Personal Communications Devices, LLC (case No. 50 494 T 00313 13), currently pending before the American Arbitration Association, International Centre for Dispute Resolution. The respondents, HTC America Inc. and HTC Corporation (respondents or HTC), began the arbitration, seeking to recover payment for products HTC delivered to PCD for the period between April 2011 and March 2013. It is PCD’s contention that such products were defective, entitling PCD to offsets as well as its own damages. The respondents oppose the *792 instant motion and argue that this matter should proceed to arbitration. The arguments of the parties are set forth below.
Petitioner asserts that, while it recognizes a strong federal policy favoring arbitration,[1] the policy is grounded on the condition that the parties involved have consented to such a process. In this case, PCD asserts that: (1) as the entity that merely purchased the assets of a signatory to a supplier agreement, originally entered into in 2003 and amended by an addendum in 2006, it never consented to arbitration; (2) the agreement to arbitrate, even if PCD is deemed a party thereto, expired three years before the alleged payment defaults that are the subject matter of the parties’ disputes occurred; and (3) subsequent agreements between the parties hereto, which constitute purchase orders for items that are at the heart of the parties’ dispute, all specifically require resolution before a court located in Suffolk County, New York. Since the party seeking arbitration bears the burden, under New York law, of proving the existence of arbitration, and PCD never signed the initial supplier agreement, which is the only document setting forth an arbitration provision, it is PCD’s assertion that HTC cannot sustain its burden of demonstrating that PCD falls within any of the limited exceptions to the federal rule requiring consent (such being assumption, incorporation by reference, agency, veil piercing, and/or estoppel). PCD also argues that a court has the authority to determine both whether a dispute is arbitrable and, in making such decision, to address whether such agreement has, in fact, been terminated.
Respondents support the strong federal policy favoring enforcement of arbitration agreements. However, it is here that the parties’ agreement ends. According to HTC, PCD is bound by the terms of the supplier agreement as a successor by merger to a signatory. As such, it is asserted that PCD is liable for all the contractual obligations of its predecessor under New York law.[2] In this case, the original signatory, Audiovox, assigned its rights and obligations to an entity called UTStarcom, which specifically undertook to assume all obligations under Audiovox’s supplier agreement. Then, effective July 1, 2008, according to respondents, UTStarcom merged with and into PCD, which has publicly set forth that it is a successor to both *793 UTStarcom and Audiovox. HTC also asserts that PCD has continuously signed new agreements with HTC, acknowledging both the continuing validity as well as the parties’ ongoing rights and obligations under the supplier agreement. They claim that the arbitrator, and not the court, is the entity that must determine issues of contractual interpretation which surround the issue of whether the supplier agreement has expired. Based upon the acts of PCD, in any case, respondents set forth that petitioner is estopped from denying the arbitration provision of the agreement from which it continued to derive direct benefits and that the language of the various agreements demonstrate that the supplier agreement has not terminated.
Parties’ Various Agreements
To the extent relevant to the legal issues set forth above, the court sets down certain provisions contained in agreements since 2003. They are annexed to the affidavit of Stephanie Bariault, the vice-president of operations for HTC America Inc.
On July 2, 2003, HTC (located in Taiwan) and Audiovox Communications Corp. (located in Hauppauge, New York) entered into a supplier agreement whereby HTC manufactured and sold to Audiovox certain digital devices for resale in North America. The supplier agreement contained a two-year term and provided a process for termination for cause by either party. It also provided, at paragraphs 8 and 9, a procedure for rejection of defective items which included a requirement for HTC to bear responsibility for costs and expenses to correct the same upon what is defined as “Epidemic Failure.” With regard to disputes, the supplier agreement (exhibit A to Bariault aff) states (at para 19):
“Any controversy or claim arising out of or relating to this agreement, or the breach thereof, which does not involve claims by or against third parties, shall be settled by arbitration in the City of New York in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof. This Agreement shall be governed by and construed with the laws of the State of New York, without regard to its conflict of law rules.”
On October 29, 2004, Audiovox sold its wireless business and assets to UTStarcom Personal Communications LLC (UTStarcom). *794 UTStarcom. signed an amendment to the supplier agreement with HTC (exhibit B to Bariault aff) setting forth that “ [effective November 1, 2004, the transaction has closed. Upon the closing, UTStarcom has legally undertaken to assume all obligations under ACC’s Agreement . . . with HTC dated July 2, 2003.”
HTC agreed as of such date to the transfer of the agreement from Audiovox to UTStarcom.
On August 31, 2006, UTStarcom and HTC executed addendum No. 1 to the supplier agreement by and between UTStarcom and HTC. The addendum to the supplier agreement (exhibit C to Bariault aff) states that the July 2, 2003 agreement was assumed by UTStarcom and its subsidiary UTStarcom Personal Communications LLC and sets forth that
“3. HTC and UTPC agree that the remaining terms of the Supplier Agreement shall be reinstated continuously and extended beyond the expiration date. Except as set forth herein, all the terms of the Agreement shall remain in full force and effect.
“4. . . . The Addendum will continue for the same term as the Supplier Agreement, unless terminated by either party upon thirty days written notice at which time HTC will be responsible for all past due amounts under this Addendum.”
Thereafter, UTStarcom Personal Communications LLC (referred to as the Company) was merged into Personal Communications Devices Holdings LLC (the petitioner in this action, referred to as MergerCo). On June 30, 2008, under an agreement termed “MERGER AGREEMENT” (annexed as exhibit A to the aff of Craig Parietti, vice-president of finance for HTC America Inc.) it was agreed that “(a) the Company shall be merged with and into MergerCo and the separate corporate existence of the Company shall thereupon cease, (b) MergerCo shall be the surviving entity in the Merger.”
The merger agreement was stated to be construed in accordance with the laws of the State of New York.
Respondents annex two documents entitled “LETTER OF AGREEMENT” to the Bariault affidavit (exhibits D and E). The letter of agreement dated November 10, 2011 states that it is outlining terms and conditions relating to the return process of certain defective main boards stating that it is made:
“(u)nder the Supplier Agreement dated July 2, 2003 (together with the assignment letter dated October *795 24, 2004, Addendum No 1 dated August 31, 2006, and other related legally binding documents (collectively the ‘Agreement’)) by and between Personal Communications Devices, LLC, . . . successor by merger to UTStarcom Personal Communications LLC, successor by assignment from Audiovox Communications Corp . . . and HTC Corporation formerly known as High Tech Computer Corp, a Taiwan company.”
It also states that “[e]xcept as set forth herein, all other terms and conditions set forth in the Agreement shall remain in full force and effect.”
An agreement containing the identical quoted terms was entered into between HTC and PCD, relating to replacement unit provisions for the Droid Incredible 45 LTE by HTC purchased under the supplier agreement, the 2004 assignment letter and 2006 addendum on July 19, 2012. In addition, the Bariault affidavit annexes three documents signed by the parties to this proceeding entitled “Product Addendum” (exhibits G, H, I). Each refers to a particular product sold to PCD by HTC for a certain price and states that it is:
“(m)ade part of and incorporated by this reference into the Supplier Agreement, entered into by and between HTC corporation . . . and Personal Communications Devices, LLC ... as a result of a forward merger agreement, formerly known as UTStarcom . . . assigned from Audiovox . . . dated July 2, 2003 (together with the assignment letter agreement dated October 29, 2004, Addendum No 1, dated August 31, 2006, and other related legally binding documents (collectively the ‘Agreement’)).
“This Product Addendum is intended to complement and not conflict with the terms of the Agreement.”
Petitioner annexes a sample purchase order to the affirmation of David A. Paul, Esq., which states as follows:
“This Agreement shall be governed, construed and interpreted in accordance with the internal laws of the State of New York, without application of conflict of laws principles. This Agreement shall not be governed by the United States Convention on the International Sale of Goods. The parties hereto consent to the jurisdiction of any court located in Suffolk County, New York and waive objection to *796 such venue. . . .
“This Agreement will not supercede or take place of any written agreement which is signed by both parties and covers the same subject matter as this Agreement or its related purchase orders.”
Enforcement of Arbitration Agreements
There exists a strong federal policy favoring the enforcement of arbitration agreements, especially those involving international and interstate commerce. (9 USC § 2; Paramedics Electromedicina Comercial, Ltda v GE Med. Sys. Info. Tech., Inc., 369 F3d 645 [2d Cir 2004].) Where a broad arbitration clause is found in a commercial agreement, it can be overcome by a demonstration that the controversy between the parties is somehow outside the purview of the particular dispute. (Id.; WorldCrisa Corp. v Armstrong, 129 F3d 71 [2d Cir 1997].) The Federal Arbitration Act (FAA) itself, under section 3, directs the district courts to stay court proceedings in those instances where the parties have agreed in writing to arbitrate the issues before it. (Id.) Although the agreement at issue in this case is governed by the FAA, there is a similar policy in this state that, where parties enter into a contract setting forth that disputes arising in connection with such agreement are to be resolved by arbitration, any controversy arising within the compass of such provision must indeed be arbitrated. (Matter of Exercycle Corp. [Maratta], 9 NY2d 329 [1961].)
Despite this general rule, it is the court rather than the arbitrator, which generally has the initial authority to decide whether parties have in fact agreed to arbitrate a dispute, unless the agreement in question provides otherwise. (First Options of Chicago, Inc. v Kaplan, 514 US 938 [1995].) The Supreme Court has instructed that in making the determination, the courts are to look to applicable state court principles governing contract law. (Id.) Although there exists a presumption of arbitrability where a valid and enforceable arbitration agreement has been formed, such presumption has been limited to those instances where the party seeking to enforce arbitration demonstrates that the parties have in fact agreed to submit the dispute in question to arbitration. (See Granite Rock Co. v Teamsters, 561 US —, 130 S Ct 2847 [2010].) Therefore, the federal policy favoring arbitration has been held to support the notion that the purpose of Congress in enacting the FAA “was to make arbitration agreements as enforceable as other *797 contracts, but not more so.” (Cap Gemini Ernst & Young, U.S., L.L.C. v Nackel, 346 F3d 360, 364 [2d Cir 2003] [emphasis omitted].) Likewise, under New York State law, parties to a commercial transaction will not be held to have chosen arbitration as the forum for resolution of their dispute in the absence of an explicit commitment. (Matter of Marlene Indus. Corp. [Carnac Textiles], 45 NY2d 327 [1978]; Matter of American Centennial Ins. Co. v Williams, 233 AD2d 320 [2d Dept 1996].)
Binding the Nonsignatory
Based upon these general principles, a party, who never signed an arbitration agreement, cannot be required to submit to arbitration those disputes which it has not agreed to submit, unless the court finds that the parties’ conduct or positions bring the nonsignatory within one of five recognized exceptions; those being: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piereing/alter ego; and (5) estoppel. (Merrill Lynch Inv. Mgrs. v Optibase, Ltd., 337 F3d 125 [2d Cir 2003]; Republic of Iraq v ABB AG, 769 F Supp 2d 605 [SD NY 2011].)
A party is estopped from denying its obligation to arbitrate a dispute when it has received a direct benefit from the contract containing the arbitration clause. (American Bur. of Shipping v Tencara Shipyard S.P.A., 170 F3d 349 [2d Cir 1999]; Life Tech. Corp. v AB Sciex Pte. Ltd., 803 F Supp 2d 270 [SD NY 2011].) In American Bur. of Shipping v Tencara, the builder of a racing yacht and the American Bureau of Shipping (ABS) entered into an agreement dealing with ship classification, which contained a broad arbitration clause for disputes. The yacht owners were never signatories to this agreement; however, they received the benefit of lower insurance rates on their ship based upon an interim class certification issued by ABS to the builder and forwarded to the owners, which incorporated their agreement by reference. In addition, as a result of this interim certification, the owners received the benefit of being able to sail under the French flag. When a dispute arose as a result of damage to the ship, ABS was successful in obtaining a court directive against nonsignatory owners to arbitrate their dispute. The court found that the owners had indeed received such direct benefits from the agreement requiring arbitration and that they were, therefore, estopped from seeking to avoid the same. (Id. at 353.)
In Life Tech. Corp., one party, DH Tech, signed a purchase agreement with Life Tech containing a broad arbitration clause, *798 which contemplated a second contract in the form of a licensing agreement by the parties or their affiliates. The affiliate of DH Tech, AB Sciex, which signed the licensing agreement, was not a signatory of the original agreement. The District Court found that AB Sciex was, however, estopped from staying the licensors’ demand for arbitration because the first contract anticipated the second and contained the broad arbitration clause; the first contract was the one that created the direct benefit to the nonsignatory; and the second agreement was necessary to complete the business contemplated by the first agreement. (Id. at 277; see also Matter of SSL Intl., PLC v Zook, 44 AD3d 429 [1st Dept 2007].)
In contrast, where the benefit a nonsignatory receives from an agreement containing a broad arbitration clause is considered indirect, it will not be bound by the same (see MAG Portfolio Consultant, GMBH v Merlin Biomed Group LLC, 268 F3d 58 [2d Cir 2001]). In this case, the court found that the sole relationship between nonsignatory parties and those that had signed the agreement containing the arbitration clause was that they were competitors in the same industry; and that their benefit did not flow from the original agreement itself which they never assumed; but, rather, indirectly from their exploitation of the contractual relation of the parties to the original agreement. No estoppel existed. (Id. at 61.) Likewise, in a case where a parent corporation never assumed an obligation found in an agreement between its subsidiary and the subsidiary’s supplier, containing a broad arbitration clause, there were no grounds for enforcement of the arbitration provision against the parent company. (Thomson-CSF, S.A. v American Arbitration Assn., 64 F3d 773 [2d Cir 1995]; see also Oxbow Calcining USA Inc. v American Indus. Partners, 96 AD3d 646 [1st Dept 2012].)
Another instance where courts may enforce an arbitration clause involving one of the parties to the lawsuit that is a non-signatory is termed “incorporation by reference.” Thus, a non-signatory may either be compelled or itself compel arbitration where such entity has entered into a separate agreement that does not itself contain an arbitration clause but that specifically incorporates an agreement that does so. (See Rosner v Peregrine Fin. Ltd., 1998 WL 249197, 1998 US Dist LEXIS 7170 [SD NY, May 15, 1998, No. 95 Civ. 10904(KTD)].) However, where a non-signatory to an agreement containing an arbitration clause signs a note (as assignee) which merely mentions the agreement for purposes of calculation of a term of the debt and also states that *799 the lender and borrower “prefer that any dispute be resolved in litigation,” the court will not compel arbitration. (GEPF, Inc v City Lights Intl., Inc., 2010 WL 5222124, *3, 2010 US Dist LEXIS 135433, *7 [SD NY, Dec. 22, 2010, No. 09 Civ. 4942(PAC)].)
A third exception to the general rule that a nonsignatory cannot be bound by an express agreement to arbitrate disputes between other parties is known as “assumption.” In Orlogin, Inc. v U.S. Watch Co. (1990 WL 364470, 1990 US Dist LEXIS 7794 [SD NY, June 25, 1990, No. 90 Civ. 1106 (RJW)]), the District Court found that a nonsignatory to a purchase agreement, containing terms similar to the one at bar, was held to be bound by the agreement as a result of the merger of the signing party into the entity claiming exemption. In that case, the court found, applying the applicable law of Pennsylvania and Delaware, that, when the nonsignatory was created upon merger, the constituent corporations ceased to exist and all debts, liabilities and duties of the signatory/constituents became those of the surviving corporation. (1990 WL 364470, *6, 1990 US Dist LEXIS 7794, *16-19.)
Postexpiration of Arbitration Agreement
Even where a nonsignatory may be found, under one of the doctrines set forth above, to be bound by an arbitration agreement, such is generally not the case where the underlying agreement itself is no longer in effect. The Supreme Court has held that the object of an arbitration clause is to implement the parties’ contract and not to transcend it. (Litton Financial Printing Div., Litton Business Systems, Inc. v NLRB, 501 US 190 [1991].) In that case, a postexpiration grievance under the National Labor Relations Act was held to arise under the contract that provided for arbitration of labor disputes only where it could be determined that a management action taken after the expiration of such agreement infringed upon a right that accrued or vested under the agreement itself or, under principles of contract common law, the contractual right survived expiration of the agreement. (Id. at 206.)
Which Entity Determines Whether Agreement to Arbitrate was in Effect
While, as set forth above, the law is clear that the courts and not the arbitrator, absent an express agreement to the contrary, are the proper venues to address whether parties consented to *800 arbitrate their disputes (under principles of law or equity), the law on the question of whether the court or the arbitrator must tackle the question of when and whether such agreement is still in effect at the time of the incidents giving rise to the dispute is somewhat murky. Of course, the court only reaches this second issue if it determines that the parties either agreed to arbitrate or that the party opposing the same falls within one of the exceptions set forth by the United States Supreme Court, supra.
In 2003, the Second Circuit addressed this issue in a case arising under the FAA. In ACEquip Ltd. v American Eng’g Corp. (315 F3d 151 [2d Cir 2003]), the court agreed with what it termed all prior precedent that the issue of whether a non-signatory to an arbitration agreement can either itself enforce or be enforced by the other party to engage in arbitration is one for the courts, (id. at 155.) However, the court went on to state that, where there is an issue concerning whether a valid agreement to arbitrate was in effect at a particular time, often two questions must be answered: (1) whether an arbitration agreement itself existed which can be enforced against a non-signatory; and (2) whether such agreement has been terminated. (Id.) The court goes on to state that while the first issue is one for the court to decide, the arbitrator should determine issues such as expiration or termination because these involve interpretation of the agreement itself. (Id.)
In 2010, the United States Supreme Court was called upon to answer similar questions in the context of a labor dispute. In Granite Rock Co. v Teamsters (561 US —, 130 S Ct 2847 [2010]), the Court stated that
“[flor purposes of determining arbitrability, when a contract is formed can be as critical as whether it was formed. That is the case where, as here, the date on which an agreement was ratified . . . determines whether the agreement’s provisions were enforceable during the period relevant to the parties’ dispute.
“This formation date question requires judicial resolution here because it relates to Local’s arbitration demand in such a way that the District Court was required to decide the CBA’s ratification date in order to determine whether the parties consented to arbitrate the matters covered by the demand.” (561 US at —, 130 S Ct at 2860.)
In 2012, the United States Supreme Court reviewed the separate issues of arbitrability under the FAA and validity of a *801 contract involving a noncompete clause in Nitro-Lift Technologies, L.L.C. v Howard (568 US —, 133 S Ct 500 [2012]). The Court set forth that, once the trial court determined that a contract binding the parties contained a valid arbitration clause, “it is a mainstay of the Act’s substantive law that attacks on the validity of the contract, as distinct from attacks on the validity of the arbitration clause itself, are to be resolved by the arbitrator in the first instance, not by a federal or state court.” (568 US at —, 133 S Ct at 503 [internal quotation marks omitted].)
A careful review of the history of the parties’ commercial relationship, as well as the documents commencing from the July 2, 2003 supplier agreement through and including the June 30, 2008 merger agreement demonstrate that under the integrated doctrines in federal and state law set forth above, petitioner PCD became a party to the supplier agreement, containing a broad arbitration clause governing its commercial disputes with its supplier of goods, HTC. As a nonsignatory of the supplier agreement, PCD became bound by the provisions thereof under the doctrine of estoppel. The court reaches this determination based upon the fact that PCD has received direct benefits as a result of the supply contracts which, taken together, contain the arbitration clause. As in the case of Life Tech., although not a signatory to the 2003 agreement, 2004 amendment and the 2006 addendum, PCD was formed specifically to carry on the business of UTStarcom. A series of correspondences from PCD to HTC from 2009 through 2012, annexed to respondents’ papers and affidavits, demonstrates that PCD repeatedly invoked the terms of the supplier agreement, which it utilized to its direct benefit. These included a statement by PCD regarding its return of inoperable devices to HTC conditioned upon the terms of the supplier agreement stating “(t)hat has always been a condition.” (Crowder aff, exhibit A.) PCD’s chief operating officer, Jorge Garcia, wrote to HTC in April 2012, invoking the “Epidemic Failure” provisions of the supplier agreement, and stating that “[t]he 6350 charging port issue is rapidly approaching the epidemic failure level. We are using the criteria defined in the supplier agreement.” (Bariault aff, exhibit J at 3.) On March 1, 2013, PCD’s William Schlegal invoked the supplier agreement yet again with regard to alleged equipment failure, stating “(i)f after evaluation, the situation meets the criteria of epidemic failure, we will in fact present to you per the terms of the contract.” (Bariault aff, exhibit L at 1.) *802 Similar correspondence is annexed to the respondent’s Crowder affidavit, in which PCD officials repeatedly and specifically invoke terms of the supplier agreement, which contains the broad arbitration clause at issue. The fact that PCD purchased over $5 billion of equipment from HTC under the supplier agreement demonstrates that as successor by merger to a signatory thereto, it derived direct, as opposed to indirect, benefits from the supplier agreement and comes within one of the exceptions set forth by the federal courts in bringing nonsignatories to an arbitration clause within its ambit. As set forth above, in addition, PCD continuously wrote letters of agreement to HTC regarding specified goods in which it repeatedly referred to the fact that the supplier agreement along with its addendum and amendment, to which it defined itself as a party, as successor by merger, remained in full force and effect.
The court also finds that PCD is bound by the terms of the 2003 supplier agreement, with its amendment and addendum, and indeed assumed the same, for the precise reasons set forth in Orlogin, Inc. v U.S. Watch Co. Here, as in that case, a nonsignatory to a purchase agreement must be bound by the agreement to arbitrate where the signatory has merged into the nonsignatory entity, and thereby ceased to exist. In this case, under New York law, just as under Delaware law and Pennsylvania law in Orlogin, successors by merger are bound by arbitration agreements signed by the corporation that ceased existence upon merger. (See Matter of AT&S Transp., LLC v Odyssey Logistics & Tech. Corp., 22 AD3d 750 [2d Dept 2005].) As demonstrated by the language of the merger agreement itself, on June 30, 2008, under which the signatory to the supplier agreement, amendment and addendum, UTStarcom, merged with and into PCD, the signatory specifically ceased to exist and PCD became the surviving entity, assuming all UTStarcom’s obligations and liabilities. This clearly included the supplier agreement, amendment and addendum, containing the arbitration provision.
As the court stated above, the question of whether the supplier agreement itself, along with its amendment and addendum, existed in the period between 2011 and 2013, when the disputes concerning payment for and alleged defects with goods arose, is more complex. As the parties argue, there exist genuine disputes concerning the meaning of the terms of the addendum and whether it operated to extend the parties’ agreement without any fixed term, subject to the right to terminate in writing or whether it merely extended a prior agreement for a two-year *803 period, thereby terminating prior to the specific controversy at issue. There exists a dispute as to whether the course of the parties’ conduct in the various letters of agreement acted to continue and bind PCD to the entire supplier agreement containing the arbitration clause. There exists a dispute as to whether the correspondence references to the supplier agreement and its terms in the very disputes now pending also demonstrate that the parties’ conduct continued the agreement. If these writings did not demonstrate the continued existence of the supplier agreement, there exists the issue of the meaning of the provisions in the purchase orders.
It is the court’s belief that the United States Supreme Court ruling most closely analogous to the one at bar is that in Granite Rock Co. v Teamsters. Here, as in that case, the determination of when an agreement (containing an arbitration clause) is in effect is inextricably related to whether the parties are bound by an agreement to arbitrate. In making this decision, the court finds that the recent Supreme Court holding in Life Tech, is distinguishable. The issue of whether an agreement is valid where it contains a broad noncompete clause goes to the heart of the validity of the agreement. This court does not make that determination; but, rather, looks to whether it expired two years after the 2006 writing or continued by its terms. Thus, although the court would be glad to refer such issue to the arbitrator having determined that PCD is estopped from denying that it was bound by the supplier agreement, as a result of estoppel and merger, the continued existence of such agreement goes to the heart of whether the parties’ current controversies are arbitrable.
Here, viewing the writings of the parties, it is this court’s belief that the supplier agreement, along with the amendment and addendum, remained in effect for the entire period between the date PCD came into existence as the successor by merger to UTStarcom, a signatory by assumption, of the supplier agreement through the dates of controversy. Under New York law, which applies to the interpretation of contracts in this case, the writings of the parties should be interpreted to give force and effect to their true intent. (Greenfield v Philles Records, 98 NY2d 562 [2002].) In 2006, HTC and UTStarcom entered into an addendum to the supplier agreement (as well as its 2004 amendment) which specifically stated that the supplier agreement itself was to be “(r)einstated continuously” until terminated by one of the parties in writing and that the 2004 *804 amendment was to have the same term as the supplier agreement. There is no dispute that the required termination in writing has not occurred. This court has already determined that PCD became a party to the supplier agreement, amendment and addendum on the date of merger in July 2008. Thus, viewing the four corners of the addendum, specifically reinstating without term, the supplier agreement, such remains in effect until terminated in writing, an act that has clearly not occurred. As the court has determined that PCD is a party by estoppel to the arbitration agreement and that the supplier agreement containing the arbitration agreement was reinstated in 2006 without term, subject only to termination in writing by one of the parties, the court must necessarily reject PCD’s argument that the provisions of its purchase orders take the dispute out of the arbitration venue.
The court notes, in addition, that following execution of the addendum and the merger agreement, PCD, by its course of conduct, has demonstrated that it too continued to believe that these agreements were in force and effect as set forth in the various letters of agreement annexed to the Bariault affidavit. The correspondence by PCD officers and employees through March 2013 also continued to refer to terms of these agreements. Viewed in its entirety, the court finds that the parties clearly manifested their intent through their various writings to keep the supplier agreement, amendment and addendum in effect through the dates of dispute herein.
Based on the above, this court finds that: (1) PCD was bound by the terms of the 2003 arbitration agreement contained within the supplier agreement, as amended in 2004 along with its 2006 addendum both as a successor to the signatory and by the doctrine of estoppel; and (2) the supplier agreement along with its amendment and addendum were in effect through the period between 2011 and 2013 when the commercial disputes between HTC and PCD arose. In making these determinations, this court is not opining on any other issues regarding the validity of the supplier agreement, amendment and addendum, nor with respect to the rights of the parties in their dispute concerning claims of payment and defect. All such other issues are to be determined by the arbitrator.
Accordingly, petitioner PCD’s motion to stay arbitration is denied for the reasons set forth.

. The Federal Arbitration Act applies to this dispute since it involves international and interstate commerce. (9 USC §§ 1, 2.)

. The P CD -UTStarcom merger agreement contains a New York choice of law provision (exhibit A to Hanson aff).